OPINION OF THE COURT
Kenneth L. Gartner, J.
This decision, reached after trial without jury, significantly *771 differs with the conclusion reached by another recent officially reported decision addressing (1) the extent of the discretion possessed by a court to excuse a rent-stabilized tenant’s failure to timely return an executed acceptance of an offer of a renewal lease; and (2) the effect upon this issue of new amendments to the Emergency Tenant Protection Regulations.
Respondent Dennis Ramos resides in the subject rent-stabilized apartment with his wife, respondent Carmen Ramos, and their three children. Respondent Ismael Ramos is Dennis’s father. Ismael now lives in Florida. Ismael is the named tenant.
Ismael moved to Florida over 10 years ago. Since Ismael moved to Florida, the offers of renewal leases required by the Emergency Tenant Protection Act of 1974 were repeatedly tendered by the landlord, and executed by Ismael. Dennis would forward to Ismael in Florida the renewal offers received by certified mail from the landlord. Ismael would execute the acceptances of the renewal offers and send them back to Dennis for transmission to the landlord.
This past year, the process went awry.
On or about May 16, 2001, the landlord sent, by certified mail addressed to Ismael Ramos, an offer for a renewal lease. Dennis, however, never received it at the premises. Dennis does not know exactly why he never received it. One possibility suggested by him is that while the address correctly contained the legend “Apartment 2E,” it also, next to Ismael Ramos’s name, contained the legend “G2.” The landlord asserted that this legend indicated only that the lease carried with it the rental of two (“2”) garage (“G”) spaces. Nevertheless, the G2 legend, Dennis suggests, might have been taken by the post office to be the designation of another apartment on the second floor, resulting in the letter’s misdirection.
According to notations apparently placed on the letter by the post office, delivery was attempted on May 22 and June 4. The letter was then returned to the landlord as “unclaimed.”
On or about June 25, 2001, the landlord issued a notice of termination declaring that the occupancy of the premises by the Ramos family constituted overcrowding, and that the lease would be terminated effective July 13 if the condition was not cured.
Dennis immediately contacted Joseph Nicaj, a representative of the landlord identified in published news reports as “operations manager.” (See, Newsday, Friday, Nov. 30, 2001, at 27 *772 [“Latin Tenants: Owner Targeted Us”].) Dennis expressed his desire to remain in occupancy. He expressed his desire to reinstate his tenancy, even if it meant paying an 18% vacancy rate increase rather than a 2% renewal increase in rent. Nicaj was not responsive.
On July 13, the cure period expired.
On July 16, unbeknownst to Dennis, the 60 days for returning the renewal offer expired.
On July 25, the landlord commenced a holdover proceeding against Ismael Ramos, as the named tenant, seeking eviction based on the alleged termination of the lease due to overcrowding.
Subsequently, the landlord withdrew the overcrowding proceeding (asserting that it, on investigation, had not found overcrowding at the premises). Immediately thereafter, on or about October 10, 2001, the landlord instituted the instant proceeding, asserting that the tenant’s lease had expired. The landlord named Ismael, Dennis, and Carmen, all as parties-respondents.
In 67 8th Ave. Assocs. v Hochstadt (88 AD2d 843 [1st Dept 1982]), as in the instant case, the landlord sent a notice by certified mail to the tenant offering to renew the lease. In Hochstadt, as in the instant case, the notice was returned to the landlord marked “unclaimed.” In Hochstadt, as in the instant case, the tenant, during the 60-day period, did have occasion to speak with the landlord’s agent, during which he made explicit inquiry regarding a renewal lease, but was rebuffed. The Appellate Division — reversing the Appellate Term, and reinstating the judgment of Civil Court — held that “[u]nder the circumstance presented, tenant’s failure to timely respond to the landlord’s * * * renewal notice, was excusable.” (At 843.) Accordingly, the warrant of eviction was permanently stayed on condition that the tenant execute a renewal lease within 10 days after retender by the landlord.
In Baja Realty v Karoussos (120 Misc 2d 824, 825 [App Term, 1st Dept 1983]), where a tenant sent back his executed renewal two days late, the Appellate Term, relying on Hochstadt, permanently stayed a warrant of eviction conditional upon the tenant’s execution of a renewal lease at the appropriate rent guidelines percentage increase, holding that “[i]t is clear that tenant had no intention of surrendering his stabilization rights, and simply miscalculated as to when his acceptance was due. Loss of the apartment would work in extreme hardship, to be *773 weighed against no apparent prejudice to the landlord should tenant remain, other than the obvious financial advantage accruing from a vacancy.” (See also, Farchester Gardens v Licini, NYLJ, Jan. 5, 2000, at 32, col 4 [Yonkers City Ct].) In Farchester, as in the instant case, the lease renewal offer was sent by certified mail and returned to the landlord unclaimed. In Farchester, as in the instant case, during the 60 days the landlord served a notice of termination. In Farchester, as in the instant case, the tenant spoke to the landlord during the 60-day period and expressed a desire to continue in occupancy as a tenant at the premises. In Farchester, as in the instant case, the landlord during that conversation failed to bring up the unreturned lease renewal offer, and did not turn the previously “unclaimed” mail back to the tenant. Holding that “[t]his. type of gamesmanship can never be condoned or rewarded, because it violates the well-settled equitable doctrine that no one should be permitted to benefit from his wrongdoing,” the court dismissed the petition. (At 32, col 5; see also, 5700, 5800, 5900 Arlington Ave. Assoc. v Dogan, 135 Misc 2d 338, 340 [Civ Ct, Bronx County 1987] [“Equity will intervene to prevent a forfeiture arising out of a tenant’s neglect or inadvertence, especially where a landlord is not harmed by the delay and the tenant would be severely prejudiced”].)
There is authority holding that a tenant who fails to timely accept a renewal offer is not entitled to an opportunity to cure. (Carriage House Realty Co. v Conlon, 128 Misc 2d 143, 145 [Yonkers City Ct 1985].) Conlon’s holding was later endorsed and adopted by the Appellate Term, Second Department, in Young v Ruderman (NYLJ, Feb. 1, 1994, at 24, col 5). However, even Conlon acknowledged that while the failure may not be “curable,” “as of right,” the failure “may be excusable.” (At 145.) In neither Conlon nor Ruderman is there any indication that the tenants set forth any equity or circumstance which would support excusing their failure.
In addition, there is contrary authority indicating that such a failure is curable. (See, 210 Realty Assocs. v O’Connor, NYLJ, Dec. 22, 1999, at 36, col 3 [White Plains City Ct], relying on Fairbanks Gardens Co. v Gandhi, 168 Misc 2d 128 [App Term, 2d Dept 1996], affd 244 AD2d 315 [2d Dept 1997].)
Conlon and Ruderman were in fact principally addressing the very limited issue of whether, when confronted with a tenant who has failed to return an executed acceptance of a lease renewal offer, a landlord can simply begin a holdover proceeding, or must first serve an additional notice, a notice to cure *774 giving the tenant a new opportunity to execute the offer. Both courts held that no such additional notice is required.
Recent amendments of the Emergency Tenant Protection Regulations, 9 NYCRR 2503.5 (b) (2) and (3), provide:
“(2) Where the tenant fails to timely renew an expiring lease or rental agreement offered pursuant to this section, and remains in occupancy after expiration of the lease, such lease or rental agreement may be deemed to have been renewed upon the same terms and conditions, at the legal regulated rent, together with any guidelines adjustments that would have been applicable had the offer of a renewal lease been timely accepted. The effective date of the rent adjustment under the deemed renewal lease shall commence on the first rent payment date occurring no less than 90 days after such offer is made by the owner.
“(3) Notwithstanding the provisions of paragraph (2) of this subdivision, an owner may elect to commence an action or proceeding to recover possession of a housing accommodation in a court of competent jurisdiction * * * where the tenant, upon the expiration of the existing lease or rental agreement, fails to timely renew such lease in the manner prescribed by this section.”
In ATM Four v Ramos (188 Misc 2d 310, 313 [Dist Ct, Nassau County 2001]), the court interpreted Cordon {supra) as standing for the proposition that absent the new amendments a court was without discretion to address a situation such as that at bar, because “a tenant’s failure or refusal to accept an order of a renewal lease within the time period specified by law is not, by its nature, curable.” The court further interpreted 9 NYCRR 2503.5 (b) (2) as in effect administratively reversing Conlon, and establishing the proposition that “a default occasioned by a tenant’s failure to timely renew a lease, can be effectively cured where the tenant remains in occupancy and continues to pay the applicable rent.” (At 313.)
In fact, this court agrees with the ATM Four decision’s “bottom line,” but respectfully differs with the ATM Four decision on both counts of its rationale.
When 9 NYCRR 2503.5 (b) (2) is viewed together with 9 NYCRR 2503.5 (b) (3) rather than in isolation, it is evident that the two new regulations do not at all address the situations under which a court can deem a tenant’s failure to timely *775 execute and return a renewal offer to be “cured” or “excused.” Rather, these two new provisions expand the options available to a landlord, at the landlord’s sole election. These new regulations provide a landlord with the option in such a situation to either deem the lease as having been renewed at the new increased rent, and to bill and collect that rent; or to treat the lease as having been terminated, and to seek to evict the tenant as a holdover. Previously, without a signed agreement to the contrary by the tenant, the landlord could only collect the rent at the old rate, thus in effect converting the tenant to a month-to-month tenant at that rate; or seek eviction as a holdover, in which event nothing at all could be collected until a court proceeding was initiated, and then “use and occupancy” could be accepted at only the lower old rate. The preamendment situation was disadvantageous to both landlords and tenants, since by limiting the landlord’s options it virtually forced the institution of litigation, and at the same time it deprived landlords, for what could be extended periods, of rent increases.
9 NYCRR 2503.5 (b) (2) thus does not administratively overrule Conlon and Ruderman. Nevertheless, as seen from the analysis above, Conlon’s and Ruderman’s own significance is limited. The law provides a reviewing court with ample discretion to address an appropriate equitable situation.
In the instant case, where Dennis Ramos put forth sufficient evidence to rebut the usual presumption of receipt upon mailing; where (as in the Hochstadt and Farchester cases) he actually spoke to a representative of the landlord during the 60-day period for renewal and expressed a desire to remain at whatever rent was required; and where despite this contact, the lease renewal offer which had been returned to the landlord as “unclaimed” was not mentioned or turned over to him, all the conditions have been met for the tenant’s failure to be excused, and for the tenant to be entitled to a permanent “stay” of any judgment and warrant for purpose of executing a renewal.